[No. 39302-2-I. Division One. July 28, 1997.]
*In the Matter of the Marriage of* CAROL FARR, *Respondent,* and RICHARD MARTIN, *Appellant.*

*Richard Martin,* pro se.

*Lowell K. Halverson;* and *Catherine Wright Smith* and *Edwards, Sieh, Hathaway, Smith & Goodfriend, P.S.,* for respondent.

COLEMAN, J. — Richard Martin argues that the lower court abused its discretion by imposing various contempt sanctions for his failure to comply with a parenting plan. The court held Martin in contempt for refusing to cooperate with a court-appointed arbitrator and deliberately manipulating his son's decision not to spend residential time with his mother, Carol Farr. Because the contempt orders are supported by permissible findings that Martin violated the parenting plan in bad faith, we affirm those orders. But while most of the contempt sanctions were valid, the lower court ordered Martin to serve fifteen days in jail and gave him no opportunity to avoid the sanction by purging the contempt. Unlike coercive incarceration, this punitive sanction is not authorized by the marriage dissolution act. We therefore vacate the jail sanction and remand for further proceedings.

During their marriage, Martin and Farr had two sons, Alex and Evan. Upon dissolution, Martin and Farr agreed to a split custody arrangement. The guardian ad litem felt that the teenage children should live with Farr, but recommended a split residential schedule considering the boys'

adamant desire to spend equal time with each parent. Under the parenting plan, Alex was to live primarily with Martin while his younger brother stayed with Farr. The boys were scheduled to swap homes on weekends. The parents agreed to joint decision-making and Dr. Stuart Greenberg's appointment as special master to arbitrate disputes.

The parenting plan also provided that "[n]either parent shall criticize or malign the other in front of the children." Moreover, it incorporated the parents' agreement to cooperate with each other:

> Each parent shall exert every effort to maintain free access, or unhampered contact between the children and the other parent so as to foster affection between the children and the other parent. Neither parent shall do anything that will estrange the children from the other parent, nor shall a parent do anything that would tend to injure a child's opinion of the other parent, or to impair in any way the natural development of the children's love and respect for both parents.

Evan and Alex were to continue seeing a counselor chosen by their parents. The parenting plan warned that violations of its provisions could be punished with contempt.

Soon after the divorce, problems arose. Alex spent no residential time with his mother. Martin told Farr that he could not successfully encourage Alex to visit her. When Martin called one day, Farr told him that Evan was not home and to call on his separate phone line. Martin then left Evan 10 successive messages on Farr's answering machine, stating in part:

> Hi, Evan, it's your dad, uh, this is a the report of the 14th time . . . that your mother has refused to pass through a call from your father. . . .

> . . . . [Y]our mother doesn't seem to understand that she is divorced, but she is obligated to let me speak to you while at her house, unless she wants to get a court order to change that, so, uh, give me a call . . . . [W]e need to kind of work out how we are going to deal with this ongoing harassment, uh, that your mother seems to be directing at you. . . .

I'll proceed on ahead and get you that [pager], and then we can avoid having all of this conflict created by your mother every time I, you know I am really quite tired of calling you and having your mother give me a ration of shit.

. . . .

Another day, Martin left a message asking if Evan wanted to join him and Alex for the weekend, stating "or if you are not part of the family, then you can let me know that as well."

Farr believed that Martin was deliberately alienating Alex from her. In May 1996, the court ordered the parents to submit to arbitration. But Greenberg resigned as special master because Martin would not cooperate in the process. According to Greenberg, Martin said that he had never wanted him to act as arbitrator and that neither he nor his children had any respect for Greenberg's authority.

On July 22, 1996, the court held an evidentiary hearing on Farr's motion for contempt. Greenberg testified that Martin was a completely uncooperative and angry man. He further testified that Martin conveyed his lack of respect for Farr to the children and got angry at Evan for taking his mother's side on some issues. Evan testified that Martin disparaged Farr in front of him. In tears, Alex testified that when his parents first divorced, he had wanted to spend equal time with each, but that he decided not to visit Farr after the dissolution was final. Alex had stopped seeing the counselor designated in the parenting plan once Martin found a new one for him.

On August 1, 1996, the trial judge entered an order holding Martin in contempt. The court found that he had "deliberately acted to derail the Parenting Plan without justification[.]" It also found that Martin's unwarranted hostility toward Greenberg and the guardian ad litem showed that he had never intended to follow the parenting plan. Moreover, the court found that Martin had subtly manipulated Alex's choice to spend no residential time

with his mother by displaying extreme hostility toward her. After finding that Martin had also violated the parenting plan by unilaterally selecting a new counselor for Alex, the court found that his "mean-spiritedness has harmed the children [and that his] words and opinions have been toxic, and have served to alienate Alex from the mother[.]" In its conclusions of law, the court ruled:

2.3 The Respondent is adjudged in contempt of Court for deliberately sabotaging the parenting plan, including provisions for arbitration; provisions for a Special Master; provisions for a residential schedule whereby the children would live with both parents; provisions for continuing counseling; provisions for prior consultation on matters of the children's welfare; and provisions whereby each parent is to encourage the parent/child bond.

2.4 The Respondent is in contempt of RCW 26.09.184 for exposing the children to harmful parental conflict, as Respondent has highly manipulated Alex to his own ends, and has maligned the children's mother to an extreme degree, and has demonstrated no regard for their need for her involvement in their lives.

2.5 Respondent is in contempt for acting in bad faith in not complying with the residential terms of the parenting plan[.]

The court ordered Martin to cease degrading Farr and involving the children in the conflict. It also ordered that Alex spend 51 days consecutively and exclusively with Farr and prohibited Martin from contacting Alex during that time except for reasonable telephone calls. Finally, the court imposed a 90-day jail sanction, suspending 89 days "on condition that [Martin] strictly comply with the Parenting Plan[.]" Martin served his day in jail, but Alex refused to make up any lost residential time with his mother.

A month later, Alex was injured in a car accident and hospitalized. He called Martin, who decided to go to the hospital without informing Farr. According to the medical report, Alex's doctor "talked with his father about the injury and expectations, and dad will be picking [Alex] up

tonight." Because Alex refused to go to Farr's house, Martin felt that "it was in [Alex's] best interest to be dropped off at a friend's." Martin later called Farr to tell her about the accident.

Farr then sought additional contempt sanctions. On October 10, 1996, the court again found Martin in contempt for "picking up Alex from the hospital and not returning him to his mother's home, when he full well knew that Alex was ordered by the court to live with his mother at that time." The court denied Martin's motion to strike Farr's answering machine tapes, ruling that Martin had "impliedly waived any statutory privacy right" by leaving the recorded messages. The court called for oral argument as to whether any suspended jail time should be imposed.

At the hearing, Martin moved for recusal of the trial judge, claiming that she had engaged in a prejudicial pattern of conduct and could not conduct an impartial hearing. The judge denied the motion, reasoning that "if I were to recuse myself, and every other judge of this court were to recuse themselves every time a litigant thinks that they have been unfair or prejudiced against them, our litigation would never end."

On November 8, 1996, the court issued a written order finding Martin in contempt:

> [T]he father's failure to return his son to his mother's home when he picked him up from the hospital was a direct contempt of the court's prior order. The court is also convinced, by a preponderance of the evidence, that prior to the auto accident and hospitalization, Alex's residing with various friends rather than going to his mother's home as ordered by the court was with the approval of his father.

The court also found that by continuing Alex's counseling with the new counselor, Martin had violated the order that Farr select a therapist. The court ruled that Martin's "continuing contempt should be punished by further confinement of fifteen days of incarceration from the

suspended 90 day sentence previously imposed." Martin was not to contact his sons until he had served his jail time and Alex made up his lost residential time with Farr.

Martin first argues that there was no tenable basis to support the lower court's contempt findings because Alex made up his own mind not to stay with his mother. Martin reasons that holding him in contempt improperly punishes Alex against his best interests. Because substantial evidence supports the finding that Martin deliberately derailed the parenting plan by exposing the children to parental conflict, we hold that the lower court acted within its discretion by holding Martin in contempt.

Greenberg testified that Martin was hostile to his and the guardian ad litem's authority. Martin's actions allow the inference that he never intended to follow the parenting plan. Alex testified that Martin unilaterally retained a new counselor for him. This violated the court's prior order that Farr choose Alex's counselor. Moreover, Martin's answering machine messages openly degrade Farr in violation of the parenting plan. While it is unlawful to record private telephone communications without consent under RCW 9.73.030(1)(a), we agree with the lower court that Martin waived any statutory privacy right by leaving messages on an answering machine. A party consents to his or her communication being recorded when another party has announced, "in any reasonably effective manner," that the conversation will be recorded. RCW 9.73.030(3). An answering machine's only function is to record messages. Knowing that his messages were being recorded, Martin had no reasonable expectation of privacy. The record provides a tenable basis to hold Martin in contempt of court.

Martin maintains that Alex made his own choice to spend no residential time with his mother. But Alex had originally wanted to spend equal time with each parent. While Alex made angry remarks about his mother at the contempt hearing, he was openly crying in court. Martin denied discouraging Alex from staying with Farr, but the

trial court is in the best position to judge his credibility. *See In re Marriage of Kovacs*, 67 Wn. App. 727, 730, 840 P.2d 214 (1992), *reversed on other grounds*, 121 Wn.2d 795 (1993). We cannot say that the lower court abused its discretion in finding that Alex's choice was highly manipulated by his father openly degrading Farr.

We also hold that Martin's actions in picking Alex up from the hospital and taking him to a friend's house warranted a contempt finding. The court had ordered Alex to live solely with his mother. Martin has failed to adequately explain why he did not call Farr as soon as he discovered that Alex had been in a car accident. Even if Martin did not encourage Alex's negative feelings about his mother, the lower court was justified in finding that Alex's refusal to stay with Farr was with Martin's approval. We affirm the lower court's findings that Martin was in contempt and that it was in Alex's best interest to reestablish a relationship with his mother.

Martin next claims that the lower court abused its discretion by suspending his visitation rights until Alex makes up lost residential time with Farr. Postponing a parent's visitation rights indefinitely may amount to an abuse of discretion in some circumstances. *See Wulfsberg v. MacDonald*, 42 Wn. App. 627, 632, 713 P.2d 132 (1986). But in this case the order is a reasonable means to attempt a reconciliation between Alex and his mother. Martin is free to challenge his visitation suspension should it become clear that Alex will never live with his mother.

Martin additionally argues that the lower court's order that Alex make up lost residential time with his mother constituted an impermissible parenting plan modification. But this sanction did not amount to a modification. *See Kirshenbaum v. Kirshenbaum*, 84 Wn. App. 798, 807, 929 P.2d 1204 (1997) (conditional and temporary visitation suspension is not a parenting plan modification). RCW 26.09.160(2)(b)(i) directs the court, upon finding a parent in contempt for bad faith noncompliance with residential provisions, to "provide the moving

party additional time with the child." Having found Martin in contempt, the lower court acted within its authority.

■ We must next decide whether the lower court abused its discretion under the marriage dissolution act by punishing Martin's contempt with jail terms. While the act authorizes the courts to imprison a parent who refuses to comply with a parenting plan, the jail term must be imposed only to coerce compliance and allow the parent to avoid incarceration by agreeing to comply. Because the lower court's punitive jail sanctions allowed no method for Martin to purge the contempt, we hold that the lower court acted beyond its authority and reverse those sanctions.

A parent's failure to comply with parenting plan provisions may justify a contempt finding. RCW 26.09.184(6). "An attempt by a parent . . . to refuse to perform the duties provided in the parenting plan, or to hinder the performance by the other parent of duties provided in the parenting plan, shall be deemed bad faith and shall be punished by the court by holding the party in contempt of court[.]" RCW 26.09.160(1). The court may sanction contempt with incarceration "if the parent is presently able to comply with the provisions of the court-ordered parenting plan and is presently unwilling to comply." RCW 26.09.160(2)(b). This power is "remedial" and may be exercised upon a motion "to coerce" a parent's compliance with residential provisions. RCW 26.09.160(2)(a), (6). Thus, rather than authorizing a determinant jail term to punish a parent, the marriage dissolution act provides only that "[t]he parent may be imprisoned until he or she agrees to comply with the [court's] order." RCW 26.09.160(2)(b).

The orders sanctioning Martin with determinant jail terms contained no provision for purging the contempt by agreeing to comply with the parenting plan. The August 1, 1996 order suspended 89 of the 90 days on the condition that Martin comply with the parenting plan. Conditionally suspending a jail sanction in this manner provides an

opportunity for the parent to purge the contempt and the sanction is thus coercive. *In re Marriage of Haugh*, 58 Wn. App. 1, 6, 790 P.2d 1266 (1990). But Martin was given no opportunity to avoid the day in jail by agreeing to comply with the parenting plan. As such, the sanction was punitive and not authorized by RCW 26.09.160.

Similarly, the November 8, 1996 order revoking 15 days of the suspended sentence can be characterized only as punishment for Martin's refusal to comply with the parenting plan. The order states that "the father's continuing contempt should be punished by further confinement of fifteen days of incarceration[.]" A fixed jail term as a civil contempt sanction must provide an opportunity to purge the contempt. *See Wulfsberg*, 42 Wn. App. at 630. Once the sanction was ordered, Martin had no means to purge the contempt.

Farr cites *Keller v. Keller*, 52 Wn.2d 84, 323 P.2d 231 (1958) for the proposition that the revocation of a suspended sentence is within the court's punitive power. But *Keller* does not control this case. While the opinion recognizes that in limited circumstances the court may punish contempt with imprisonment and provide no purging method, it predates the marriage dissolution act and focuses on the court's inherent contempt powers. *Keller*, 52 Wn.2d at 90. A court may resort to its inherent power only if there is no applicable contempt statute or it makes a specific finding that statutory remedies are inadequate. *In re Marriage of King*, 44 Wn. App. 189, 194, 721 P.2d 557 (1986). In this case, the lower court made no such finding and acted under RCW 26.09.160. Our analysis is thus confined to the scope of the court's contempt power under the marriage dissolution act. The act allows contempt proceedings solely for the purpose of coercing compliance with a parenting plan. RCW 26.09.160(2)(a). It does not authorize punishment with unavoidable jail time.

We vacate the August 1, 1996 order that Martin serve a day in jail. Because Martin served this time, however, the issue is moot. The order revoking 15 days of Martin's

suspended sentence was also punitive and provided Martin with no opportunity to purge the contempt. We must therefore vacate that sanction as well. Because this order has been stayed, our decision is not moot, and we remand with instructions to reconsider the order and include a method for Martin to purge the contempt if incarceration is still deemed necessary to ensure compliance with the parenting plan. Our holding is mandated by the express language of the marriage dissolution act. Martin must be given the opportunity to establish that he is willing to comply with the court orders and thus avoid any jail time. For example, the court could incarcerate Martin for 15 days or until he submits a satisfactory written plan detailing how he is going to comply with the court orders. This would provide a method for Martin to purge the contempt. We do not mean to foreclose other possible methods of satisfying RCW 26.09.160. We also note that criminal contempt sanctions are available if the court finds that those provided in RCW 26 are inadequate on remand. *King*, 44 Wn. App. at 194.

 Martin finally argues that the trial judge abused her discretion by denying his motion for recusal. Recusal lies within the sound discretion of the trial court. *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674, *review denied*, 127 Wn.2d 1013 (1995). A party should move for recusal before the judge has made any rulings. RCW 4.12.050. Martin failed to do so and thus needed to demonstrate prejudice on the judge's part. RCW 4.12.040; *State v. Cameron*, 47 Wn. App. 878, 884, 737 P.2d 688 (1987). Although Martin may disagree with the court's rulings, the record fails to reflect any evidence of bias.

Martin's remaining arguments are without merit. We partially grant Farr's request for fees and costs under RAP 18.9(a). Although Martin has prevailed on his challenge to the imposition of jail sanctions, his arguments relating to the right of autonomy, modification, the state privacy act, and recusal are frivolous. We award Farr her fees and costs for those portions of the appeal upon which

she has prevailed, subject to her compliance with RAP 18.1.

We affirm in part but reverse the imposition of jail time as a sanction for Martin's contempt and remand for further proceedings.

WEBSTER and ELLINGTON, JJ., concur.

Review denied at 134 Wn.2d 1014 (1998).