[No. 26656-3-II.   Division Two.   February 22, 2002.]

*In the Matter of the Marriage of* JOHN CHRISTOPHER RIDEOUT, *Respondent*, and SARA DIXON RIDEOUT, *Appellant*.

*Melissa M. Denton* (of *Ascher & Denton*), for appellant.

*Charles E. Szurszewski* (of *Connolly, Tacon & Meserve*) and *Charles K. Wiggins* and *Kenneth W. Masters* (of *Wiggins Law Offices, P.L.L.C.*), for respondent.

ARMSTRONG, C.J. — Sara Rideout did not deliver her daughter, Caroline, to court-ordered visitation with her father, Christopher Rideout. Sara explained to Christopher that Caroline refused to go. On Christopher's motion, the court commissioner found Sara in contempt, awarded Christopher costs and attorney fees, and imposed a fine. The commissioner found that Sara acted in bad faith by not delivering Caroline to her father. Sara moved to revise the commissioner's order, but the superior court upheld the order. Sara appeals and Christopher cross-appeals to argue that the commissioner awarded him insufficient costs and attorney fees. We find no error and affirm.

## FACTS

Christopher and Sara Rideout have a son, Christopher (Kit), and a daughter, Caroline. The dissolution court entered a permanent parenting plan in 1997. The plan provided that the children would reside with Sara during the summer except for four weeks with Christopher.

Sometime in June or July 2000, Christopher notified Sara of the dates for his four weeks that summer. Christo-

pher says he left several telephone messages for Sara about the dates, beginning June 18. Christopher sent Sara a letter on July 11, 2000, to confirm the dates, and Christopher's attorney also sent Sara a letter on July 14. Sara says she first learned of Christopher's plans from a telephone message on July 10. Christopher wanted to have the children for four weeks beginning July 14, 2000. He planned to take them to a family reunion in Idaho.

Christopher went to Sara's home on July 14 (at 2:30 P.M., the time specified by the parenting plan) to pick up the children, but they were not there. Later, Kit called Christopher and Christopher picked him up; Caroline was busy horseback riding and was to come later. But Sara called Christopher and said Caroline was going to stay with her.

On July 18, Christopher sought a court order setting specific dates for his summer visitation. On July 27, the court ordered that Christopher would have Caroline from July 27 through August 24. The order required Sara to transport Caroline to Christopher's house at 4:00 P.M. on July 27; Sara did not. Caroline refused to go. Caroline called Christopher twice on the 27th about the visitation, but Christopher explained that he would not negotiate with her about it.

On July 31, 2000, Christopher sought a contempt order against Sara for failing to comply with the court's July 27 order. Sara contended that she did not violate the order in bad faith under RCW 26.09.160 because Caroline had refused to cooperate with the visitation and did not want to spend time with her father. The court commissioner found that Sara had "overly involved" Caroline in the court action and had the ability to cause Caroline to comply with the visitation order. Clerk's Papers (CP) at 65. The commissioner also found that "[a] child of twelve or thirteen is not of a sufficient age and maturity that she can be given decision-making authority over whether visitation occurs." CP at 65. The commissioner then found Sara in contempt of court under RCW 26.09.160 and fined her $100 per day from July 27 through August 16. Sara also had to pay

$892.50 of Christopher's attorney fees and costs. Christopher had asked for $3,349.32. Sara moved for revision of the contempt order, which the court denied.

ANALYSIS

I. Standard of Review

The parties debate the proper standard of review. Christopher argues that we should review the trial court's decision for an abuse of discretion. Sara asks us to review the decision de novo because it was based on declarations, not testimony. Ordinarily, when a trial court has weighed the evidence and determined the relevant facts, we review the record for substantial evidence to support the trial court's factual findings. *In re Marriage of Crosetto*, 82 Wn. App. 545, 553, 918 P.2d 954 (1996). Several cases have said, however, that when a trial court considers only documents, such as parties' declarations, in reaching its decision, we need not defer to the trial court because we have the same opportunity to review the record. *See, e.g., Smith v. Skagit County*, 75 Wn.2d 715, 718-19, 453 P.2d 832 (1969); *In re Marriage of Flynn*, 94 Wn. App. 185, 190, 972 P.2d 500 (1999); *Danielson v. City of Seattle*, 45 Wn. App. 235, 240, 724 P.2d 1115 (1986). But Sara asks us to weigh the parties' credibility. And no appellate court reviewing documentary records de novo has weighed credibility.

For example, in *Smith*, the Supreme Court reviewed a documentary record de novo and reversed a trial court's decision that Skagit County's board of commissioners acted within its discretion by rezoning an island from residential to industrial use. *Smith*, 75 Wn.2d at 719. The court held that the commissioners arbitrarily and capriciously "spot zoned" the area for the benefit of a particular permit applicant. *Smith*, 75 Wn.2d at 719. But the focus of the court's review was the reasonableness of the commissioners' decision, based on the "documents, reports, maps, charts, official data and the like" that the parties submitted. *Smith*, 75 Wn.2d at 718. The court did not evaluate the

credibility of any of the evidence in the record but, rather, considered whether it justified the rezone.

And in *Flynn*, reviewing the parties' affidavits de novo, Division Three of this Court reversed a trial court's refusal to hold a show cause hearing on a petition to modify a parenting plan. *Flynn*, 94 Wn. App. at 190. But the court held that the petitioner's alleged facts, if true, warranted a show cause hearing. *Flynn*, 94 Wn. App. at 192. The court did not actually evaluate whether the evidence was credible.

Finally, in *Danielson*, Division One reviewed de novo an administrative transcript and documentary evidence. *Danielson*, 45 Wn. App. at 240. The court affirmed a trial court's refusal to order the Seattle Police Department to reinstate a discharged officer and reversed a damage award. *Danielson*, 45 Wn. App. at 240. The Court of Appeals decided that, under a police manual and due process requirements, an officer charged with a felony did not have a right to a pretermination hearing. *Danielson*, 45 Wn. App. at 240-46. And the court reversed the damages award because the police department did not violate constitutional requirements. *Danielson*, 45 Wn. App. at 247. But while the court stated that it would not defer to the trial court's factual findings, the analysis did not involve the credibility of the evidence.

Further, in a recent appeal of a trial court's denial of a full hearing on a petition to modify a parenting plan, Division Three declined to review the parties' affidavits de novo. *In re Parentage of Jannot*, 110 Wn. App. 16, 37 P.3d 1265 (2002). The court decided to defer to the trial judge and review the decision only for an abuse of discretion. *Jannot*, 110 Wn. App. at 19. The court reasoned, in part, that "a local trial judge handles domestic dockets frequently, sometimes exclusively. He or she reviews and considers these questions on a regular basis and is therefore in a much better position than us to pass upon the merits of competing allegations and affidavits." *Jannot*, 110 Wn. App. at 21. We agree.

We also agree with Division One that de novo review of the entire record on appeal is not feasible. *See In re Marriage of Stern*, 68 Wn. App. 922, 928-29, 846 P.2d 1387 (1993). The trial courts are better equipped to resolve conflicts and draw inferences from the evidence. Although the commissioner here decided the issue on declarations, he could have taken testimony if the declarations were inadequate to resolve the credibility issue and disputes between the declarations. *See* Thurston County Super. Ct. R. 43(e). This court, in contrast, allows additional evidence only in very limited circumstances and even then we generally direct the trial court to take the evidence. *See* RAP 9.11. Moreover, the trial court can consider at least parts of the entire dissolution record in deciding where the truth lies. *See* ER 201; *State v. Duran-Davila*, 77 Wn. App. 701, 705, 892 P.2d 1125 (1995) (holding that a trial court may take judicial notice of undisputed facts in court records in the same case).

■ ■ Accordingly, we decline to review de novo the parties' declarations. But we also decline to review the contempt order for an abuse of discretion. A parent seeking a contempt order to compel another parent to comply with a parenting plan must establish the contemnor's bad faith by a preponderance of the evidence. RCW 26.09.160(2)(b); *In re Marriage of James*, 79 Wn. App. 436, 442, 903 P.2d 470 (1995). If the court finds that a parent has, in bad faith, failed to comply with the parenting plan, "the court *shall* find the parent in contempt of court." RCW 26.09.160(2)(b) (emphasis added). Then, "[u]pon a finding of contempt, the court *shall* order" the contemnor (1) to provide additional visitation time to make up for the missed time, (2) pay the other parent's attorney fees and costs, and (3) pay the other parent a penalty of at least $100. RCW 26.09.160(2)(b)(i)-(iii) (emphasis added). At its discretion, "[t]he court *may* also order the parent to be imprisoned." *See* RCW 26.09.160(2)(b) (emphasis added). Other than sending a parent to jail, punishment for contempt in this context is mandatory, not discretionary. *See In re Marriage of Wolk*, 65 Wn. App. 356, 359, 828 P.2d 634 (1992).

Thus, we will review the trial court's factual findings for substantial evidence and then determine whether the findings support the conclusions of law. Here, the critical legal conclusion is whether Sara acted in bad faith in refusing to deliver Caroline to Christopher. If Sara acted in bad faith, the trial court was compelled to enter a contempt order, and we must uphold the order.

## II. Contempt Order

A parent who refuses to perform the duties imposed by a parenting plan is per se acting in bad faith. RCW 26.09.160(1). If bad faith per se is shown, the contemnor parent must, to avoid a contempt order, establish an excuse by a preponderance of the evidence. See RCW 26.09.160(4). A parent is "deemed to have the present ability to comply with the order establishing residential provisions unless he or she establishes otherwise by a preponderance of the evidence." RCW 26.09.160(4). And a parent must "establish a reasonable excuse for failure to comply with the residential provision of a court-ordered parenting plan by a preponderance of the evidence." RCW 26.09.160(4).

Sara admits that she did not deliver Caroline to Christopher on July 27, 2000, as the court ordered. But she argues that she did not act in bad faith. She contends that she tried to persuade Caroline to visit Christopher, but Caroline would not go. She believes that forcing Caroline to visit Christopher was impossible. She states in her brief, "[t]he very concept that a primary parent is responsible to force visitation upon an unwilling teen is a violation of the very laws of nature." Appellant's Br. at 3. And she argues that a contempt order is not the appropriate remedy where a child refuses to attend a planned visitation.

■ Washington's appellate courts have not decided whether a parent acts in bad faith by acquiescing in a child's refusal to participate in court-ordered visitation. Sara quotes *James*, 79 Wn. App. at 445, where Division One noted that a contempt order may not be appropriate when

compliance with the parenting plan is difficult or impractical: "For example, a recalcitrant teenager may refuse to spend time with one parent. If the parent with whom the child is living chooses not to force the issue and notifies the other parent of that decision, punishment by contempt appears to be an inappropriate remedy." *James*, 79 Wn. App. at 445. But the court's statement in *James* is dictum, as it had no bearing on the outcome of that case.[1]

Other states disagree on this issue. Indiana courts reject the notion that a child's resistance may excuse missed visitation. *MacIntosh v. MacIntosh*, 749 N.E.2d 626, 630 (Ind. Ct. App. 2001); *see also Clark v. Atkins*, 489 N.E.2d 90, 97 (Ind. Ct. App. 1986) (rejecting mother's argument that her minor children's refusal to visit their father justified her noncompliance with a visitation order); *Hartzell v. Norman T.L.*, 629 N.E.2d 1292, 1295 (Ind. Ct. App. 1994) ("[A]n adolescent's refusal to cooperate with scheduled visitation cannot divest a dissolution court of its authority to enforce its visitation orders.").

But other courts are less strict. A Pennsylvania court, after finding that the daughter's " 'negative attitude' toward her father [was] a direct result of [her mother's] conduct," upheld a contempt order where an 11-year-old girl refused to visit her father. *Commonwealth ex rel. Ermel v. Ermel*, 322 Pa. Super. 400, 469 A.2d 682, 685 (1983). The court found that the mother had impeded her daughter's relationship with her father "in every conceivable manner" and that she had failed to foster in her daughter "a sense of admiration and respect for her father." *Ermel*, 469 A.2d at 685.

And an Ohio court upheld a contempt order against a mother who argued that her five- and eight-year-old children refused to visit their father even though she had encouraged them to do so. *Smith v. Smith*, 70 Ohio App. 2d

---

[1] In *James*, the father failed to spend court-ordered visitation time with his daughter. Meanwhile, the mother failed to make the daughter available for scheduled telephone calls and failed to take her to a specified place to meet her father. The court entered contempt orders against both of them, which Division One reversed. *James*, 79 Wn. App. at 438.

87, 434 N.E.2d 749, 752 (1980). Focusing on the children's age, the court decided that five- and eight-year-old children were too young to make an affirmative and independent choice not to visit their father. *Smith*, 434 N.E.2d at 752. Because the children were so young, the court reasoned that their mother had to do more than simply encourage them to visit their father. *Smith*, 434 N.E.2d at 752.

Finally, a North Carolina court held that, where the custodial parent "does not prevent visitation but takes no action to force visitation when the child refuses to go," a contempt order is inappropriate because the parent's action is not willful. *Hancock v. Hancock*, 122 N.C. App. 518, 471 S.E.2d 415, 419-20 (1996). The court decided that, absent evidence that the mother refused to allow her son to visit his father or encouraged the child's refusal to visit, the contempt order was improper. *Hancock*, 471 S.E.2d at 419-20.

█ We hold that to find that a parent has acted in bad faith where the child resists court-ordered visitation, the evidence must show that the parent has either contributed to the child's attitude or failed to make reasonable efforts to require the child to comply. Here, the record supports a finding that Sara both contributed to Caroline's recalcitrance and failed to make reasonable efforts to require her to visit Christopher.

The events of the summer of 2000 were not isolated incidents; they followed the pattern set in 1998 and 1999. In the summer of 1998, Sara called Christopher and said that Caroline would not be going on vacation with him. She offered to allow Christopher to come over and "drag Caroline out." CP at 13. Although Christopher was entitled to four weeks of visitation, he got only two-and-a-half weeks. In the summer of 1999, when Christopher was about to leave on a two-week trip, Sara called and said that Caroline was ill. He waited two days for her to feel better, but Sara said that Caroline was still ill. Again, Christopher got only two-and-a-half weeks visitation.

In the summer of 2000, Christopher left several messages for Sara about setting the dates for his four weeks. In his second message, in the first week of July, he told her the specific dates he wanted. On July 10, Sara denied receiving the messages and said that the proposed dates were unreasonable on such short notice. Christopher wrote Sara that he would pick up the children on July 14 and return them on August 13 at 8:00 P.M. But when Christopher attempted to pick up the children on July 14, Sara's boyfriend answered the door and said he did not know where the children were. That evening, Sara called Christopher to report that Caroline was staying with her. Christopher tried to pick up Caroline again on July 15. And again, Sara's boyfriend answered the door and refused to tell Christopher where Caroline was. Yet, Christopher stated that he had "a number of very positive conversations" with Caroline about their planned trip to Idaho until late June when he began trying to set the dates for the vacation. CP at 60.

In a letter of July 14, Sara explained the problems with Christopher' plan to take the children that day. She was upset that Christopher had again delayed setting his time with the children and that she had plans with the children for the weekend of July 15. She did not mention any reluctance by Caroline to spend four weeks with her father. Sara had the children on the weekend of July 15 and 16, 2000. Christopher, who has the children on alternate weekends, tried to pick up the children for July 22 and 23, but no one was home. Christopher taped a note to the door, but Sara did not call him. And Christopher was scheduled to have Caroline for her 13th birthday on August 1, 2000. He tried to pick her up but was unsuccessful. The commissioner found that Sara "did not make [Caroline] available to [Christopher] on her birthday." CP at 65.

Most importantly, Sara from the outset has maintained that any dispute about Caroline's visitation with her father is between Caroline and her father. During the dissolution, Sara attempted to have Caroline represented by an attorney. Caroline was then nine years old. The trial court

properly refused to allow such representation, which would have made Caroline, in effect, a party in the dissolution. At the hearing on July 27, Sara presented a statement written by Caroline purportedly expressing her views as to visitation with Christopher. Christopher stated that the writing style was not Caroline's, and the commissioner found that the letter was evidence that Sara had overly involved Caroline in the action. Finally, in a declaration filed on July 25, Sara said, "Christopher Rideout is taking me to court, but his dispute is with our daughter. Since she is still a minor, she is at a great disadvantage in this dispute and I get dragged into the middle of it no matter how hard I try to stay out." CP at 27.

This evidence shows that Sara does not understand her obligation to require Caroline to comply with the parenting plan. Instead, she wants to cast herself in the role of a bystander without the power or right to require that Caroline follow the parenting plan. But the law imposes a greater responsibility on Sara. She, not Caroline, bears the primary responsibility to ensure that Caroline visit with her father according to the parenting plan. And she must, in good faith, make every effort to require Caroline to do so.

This case is similar to *In re Marriage of Farr*, 87 Wn. App. 177, 940 P.2d 679 (1997). There, Division One of this court upheld a contempt order against a father who refused to cooperate with a court-appointed arbitrator and manipulated his son's decision not to live with his mother. The trial court found that the father had "subtly manipulated [his son's] choice to spend no residential time with his mother by displaying extreme hostility toward her." *Farr*, 87 Wn. App. at 181-82. And the court concluded that the father acted in bad faith by not complying with the parenting plan. *Farr*, 87 Wn. App. at 185. Here, as in Farr, Caroline's repeated failures to visit with her father coupled with Sara's proffered excuses and her bystander attitude are sufficient to conclude that Sara was subtly manipulating the course of events to frustrate Christopher's visitation rights.

■ Sara argues, however, that the July 27 order setting the summer vacation dates was invalid because it failed to include the required warning language of RCW 26.09.165. The statute requires a warning that failure to comply with an order's residential provisions is punishable by contempt of court. RCW 26.09.165. But Sara concedes that she did not raise this issue before the commissioner or the superior court. She cannot now argue it on appeal. *See* RAP 2.5(a); *State v. Pesta*, 87 Wn. App. 515, 525, 942 P.2d 1013 (1997) (declining to address a challenge to the validity of a parenting order under RCW 26.09.165 raised for the first time on appeal).

## III. Attorney Fees

■ Christopher cross-appeals, arguing that the commissioner and judge did not award him sufficient costs and attorney fees. Under RCW 26.09.160(2)(b)(ii), the court "shall order . . . [the contemnor] to pay, to the moving party, all court costs and reasonable attorneys' fees incurred as a result of the noncompliance." Here, Christopher requested $3,349.32 in costs and attorney fees. But the commissioner determined that only $892.50 of this amount related to the contempt motion and awarded this amount.

Christopher argues that he was entitled to all of the fees relating to Sara's *alleged* noncompliance with the parenting plan and other court orders. But the only noncompliance that the commissioner found, and that the judge upheld on Sara's motion to revise, was Sara's failure to comply with the court's July 27 order. Thus, Christopher was entitled to only the fees related to his contempt motion for this violation.

As the prevailing party on appeal, Christopher is also entitled to attorney fees on appeal in an amount to be set by a commissioner of this court. *See* RCW 26.09.140; RAP 18.1(f).

Affirmed.

HOUGHTON and HUNT, JJ., concur.

Review granted at 147 Wn.2d 1008 (2002).