**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Marriage of | No. 55093-8-II |
| JENNIFER CATHERINE LESINSKI, f/n/a MIENKO, | |
| Respondent, | |
| and | PUBLISHED OPINION |
| JOSEPH ANTHONY MIENKO, | |
| Appellant. | |

GLASGOW, J.—After Joseph Mienko and Jennifer Lesinski dissolved their marriage in 2013, the trial court entered a parenting plan requiring their two sons to spend summers with Mienko in Washington and return to Lesinski in Michigan for the school year. In summer 2020, their 13-year-old son JM decided he did not want to return to Michigan.

Lesinski secured a court order directing both parents to facilitate the transfer of JM back to Lesinski's care on August 16, 2020. Early that morning, Lesinski arrived to pick up JM, but JM refused to leave his room in Mienko's home, and neither Mienko, Lesinski, nor law enforcement used physical force to attempt to move him. JM's adult sister confronted Lesinski on JM's behalf, and Mienko tried to negotiate with Lesinski in front of JM.

In a hearing the next day, Mienko requested a writ of habeas corpus allowing law enforcement to force JM to return to Lesinski, which Mienko thought would convince JM to voluntarily go with Lesinski. The commissioner granted the writ. Upon having the writ explained

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55093-8-II

to him, JM agreed to return to Michigan and was in Lesinski's custody by the afternoon of August 17, 2020.

That same day the commissioner issued an order to show cause for contempt against Mienko. After a hearing, the commissioner found contempt and imposed a civil fine and ordered Mienko to pay attorney fees. A judge declined to revise the order finding contempt.

Mienko appeals. He argues that he complied with the court orders before the contempt hearing, he was subjected to a punitive sanction, and he could not purge the contempt when he had already returned JM to Lesinski. Lesinski seeks attorney fees on appeal.

We affirm the order to show cause and the contempt order because the sanctions were not punitive and the orders were supported by substantial evidence. We deny Lesinski's request for attorney fees on appeal.

FACTS

In October 2013, a trial court entered a parenting plan for Lesinski and Mienko's three children, NM, JM, and EM. The parenting plan ordered that NM would live with Mienko in Washington while JM and EM would reside with Lesinski in Michigan during the school year. In the summers, JM and EM lived with Mienko from one week after the end of school until one week before the new school year. Lesinski and Mienko would jointly make all major decisions regarding the children. The parenting plan stated that the parties could arrange for additional parenting time by mutual agreement.

In 2020, under the parenting plan, JM and EM should have returned to Michigan on August 24, but Mienko agreed to an earlier transfer date of August 16 so Lesinski could take a family vacation with JM and EM. In July 2020, Mienko e-mailed Lesinski informing her that JM wanted

No. 55093-8-II

to remain in Washington for the following school year, despite the parenting plan. Mienko explained:

> In facilitating [JM's] return to you, the only tools I have are conversation or violence (i.e. physical coercion or intimidation). The only tool I intend to use is conversation. As such, there are limits to what I see as my reasonable facilitation of his return to you.
>
> . . . I do not intend to restrain [JM] into your vehicle, nor do I intend to allow anyone else to do so.
>
> . . . I do not intend to verbally or physically intimidate [JM] to coerce him into your vehicle, nor do I intend to allow anyone else to do so.
>
> Since it seems unlikely that you and I will agree on [JM's] precise future before August 16, my hope is that [JM] will comply with my efforts. Practically speaking; however, some portion of this is up to [JM].

Suppl. Clerk's Papers (SCP) at 152 (boldface omitted).

On August 13, 2020, Lesinski filed a petition to change the parenting plan for JM and EM to "limit [Mienko's] parenting time and participation" to "protect the children." SCP at 125. Lesinski sought to shorten the children's time with Mienko in the summer, requiring their return to Michigan two weeks before the new school year. And she requested that she be named the sole decision-maker regarding the children's education. That same day, Lesinski also requested an adequate cause decision for the proposed change to the parenting plan and an immediate restraining order against Mienko. She argued that Mienko had "engaged in a scheme of parental alienation" against her, "threatened to withhold" the children, and had told the children "they can decide where they want to live." SCP at 133. Lesinski also sought an order requiring Mienko to return JM and EM to her at 6:00 a.m. on August 16, 2020, and for an order for "a civil standby," where law enforcement would supervise the transfer of the children. SCP at 134 (boldface omitted).

3

No. 55093-8-II

Mienko appeared pro se at a hearing on these motions on August 14, 2020, telling the commissioner that he did not "intend[,] in any way, to suggest that [the children] have any sort of agency in this process" and had "never told [the children] that they can decide where they live." Verbatim Report of Proceedings (VRP) (Aug. 14, 2020) at 9. "I've made this clear to [JM], that he's going . . . that he needs to go." *Id.*

In her ruling, Commissioner Terri Farmer stated:

> THE COURT: I think -- thankfully, I don't think you need much of an order here. I think I will draft an order just for the sake of your son, to some degree, because he's a teenager, correct?

> MR. MIENKO: Yes, Your Honor.

> THE COURT: He doesn't really have any choice. That's what he need[s] to understand. Until the court order is changed, he has no choice.

> I think that's all this order is going to reflect, that he's to return with his mom as planned on the 16th . . . . *Both parents are to facilitate that.*

> I don't think law enforcement is going to help anything. . . . [I]t will only get worse with law enforcement.

*Id.* at 11-12 (emphasis added). The commissioner's written order instructed that Mienko "shall return the children to [Lesinski] as planned on 8/16/20. The child does not have a choice in this matter. They must follow the court order. Both parents shall facilitate the return of the children." Clerk's Papers (CP) at 3. The commissioner crossed out language requiring the transfer to occur by 6:00 a.m.

When Lesinski arrived at 6:00 a.m. on August 16, 2020, JM refused to leave his room to get into Lesinski's car. Mienko helped load JM's belongings into Lesinski's car, and Mienko

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55093-8-II

invited her into JM's room to try to convince JM to leave with her. Mienko let Lesinski talk alone with JM.

NM, JM's adult sister, confronted Lesinski on JM's behalf, arguing that JM had the right to decide where to live. When JM continued to refuse to leave his room, Lesinski called law enforcement, but all of the adults, including the officer who arrived, were unwilling to physically force JM into Lesinski's car. Mienko pleaded and attempted to negotiate with Lesinski in front of JM. Mienko asked Lesinski to leave JM in Washington until the parties could "'talk to the Court about this next week.'" CP at 21. Lesinski eventually left Mienko's home without JM.

Later that day, Mienko e-mailed Lesinski's attorney and offered to attempt the exchange again without NM present. Lesinski did not act upon this offer.

The parties returned to court on August 17, 2020, before Commissioner Clint Johnson. The commissioner analogized JM's refusal to return to Michigan to refusing to attend school and stated, "We're not going to hold a child in contempt, but there is clear case law that says it is the parent's obligation to fulfill the terms of the Parenting Plan, even with a resistant child. And sometimes that may mean hands on." VRP (Aug. 17, 2020) at 40-41. The commissioner warned Mienko, "You are hugely potentially at risk to be found in contempt. And the fact that [JM], a 13-year-old, is digging in his heels, quite frankly, is not a defense. . . . We don't let 13-year-olds call the shots." *Id.* at 41. "The order of the Court is [JM] is leaving with his mom. And if that doesn't happen today, then I will sign an order that directs law enforcement to retrieve [JM]." *Id.* at 42.

Mienko reiterated that he was not willing to physically force JM to go with Lesinski and requested a writ of habeas corpus, which would allow law enforcement to do so. Mienko thought this would effectively encourage JM to go with his mother. The commissioner stated that he would

5

No. 55093-8-II

sign an order for a writ of habeas corpus if Lesinski's counsel prepared one, unless Mienko "comes up with a plan that makes arrangements for an exchange today." *Id.* at 48.

When Mienko explained the concept of a writ of habeas corpus to JM that same day, JM relented and was transferred to Lesinski's custody on the afternoon of August 17, 2020. Mienko alerted Lesinski's counsel that, pursuant to the commissioner's directions, he had a plan for transfer that did not require the involvement of law enforcement, and JM was agreeing to go with his mother. Nevertheless, Lesinski's counsel submitted the writ of habeas corpus, but it is possible that counsel submitted it to the commissioner before hearing from Mienko. It is also possible that there was a lack of communication between Lesinski and her counsel after JM was transferred into her care. When the commissioner issued the signed writ and warrant so that counsel could present them to law enforcement, counsel no longer had any need to take this next step because JM had already gone with his mother. Law enforcement was not contacted.

In the meantime, also on August 17, 2020, Lesinski filed a motion for a contempt hearing seeking an order to show cause why Mienko should not be held in contempt based on Mienko's alleged violation of the parenting plan and Commissioner Farmer's August 14, 2020 order. Lesinski filed a declaration in support of the motion, alleging that Mienko "threatened to withhold" JM, "would not facilitate [JM] coming home with [Lesinski]," tried to negotiate with Lesinski regarding JM's living situation in front of JM, and "did not allow [JM] to leave" even after law enforcement arrived. CP at 20, 22. Lesinski's declaration also stated that NM was "hostile," and she aggravated the situation by telling Lesinski that she was "f[***]ing cruel" and "f[***]ing evil" for calling law enforcement. CP at 20-21.

6

No. 55093-8-II

Mienko submitted a declaration in response, stating that JM had requested NM's presence at the exchange and neither Lesinski nor the court's order prohibited NM from being there. Mienko acknowledged that he tried to negotiate with Lesinski "to stop her call" to law enforcement. CP at 31.

Commissioner Johnson issued an order to show cause for contempt on August 19, 2020, after JM returned to his mother's care.

On September 17, 2020, Commissioner Mark Gelman conducted the contempt hearing and found Mienko in contempt for violating the parenting plan and August 14, 2020 order. There is no transcript of the contempt hearing in our record. In written findings, the commissioner found that Mienko's failure to follow the parenting plan was intentional, in bad faith, and that Mienko had the ability to follow the parenting plan. The commissioner found that Mienko's failure to follow the August 14, 2020 order was intentional and that Mienko had the ability to follow that order as well. The commissioner also found that Mienko's "testimony he did not understand the meaning of or operational details of a writ of habeas corpus [was] not credible." CP at 110. The commissioner made no other written findings. The commissioner ordered Mienko to pay Lesinski $2,500 in attorney fees and a $100 civil penalty. Even though JM had already been returned to Lesinski, the order also included language indicating that contempt could be purged if Mienko "follows the Parenting Plan." CP at 111.

Mienko filed a motion for revision of the contempt order, which a judge denied. Mienko appeals.

7

No. 55093-8-II

## ANALYSIS

### I. WRIT OF HABEAS CORPUS AND WARRANT

As an initial matter, Mienko challenges the order granting the writ of habeas corpus and warrant in aid of the writ. Mienko requested the writ in order to convince JM that he had to go with his mother. Thus, the invited error doctrine precludes Mienko from challenging the order granting the writ or the writ itself on appeal. *See In re Estate of Muller*, 197 Wn. App. 477, 484, 389 P.3d 604 (2016).

To the extent Mienko asserts that opposing counsel and the commissioner should have halted the entry of the order granting the writ and warrant in aid of the writ, as well as the writ itself, because these orders were ultimately unnecessary, it is unclear on this record when the commissioner signed and filed these documents. JM was transferred to his mother's care in the afternoon on the day the commissioner signed these orders. It appears that Lesinski's communication with her attorney about the successful transfer could have been better, but given the timing, it is understandable that the successful transfer was not fully communicated to the commissioner until the next day. Law enforcement was not involved in the transfer of JM to Lesinski, JM did not have contact with law enforcement as a result of the writ, and Mienko was never arrested. We therefore find the commissioner did not err by signing and filing these documents, even though the commissioner had imperfect information about their continued necessity at the time.

### II. SHOW CAUSE ORDER

Mienko argues that the commissioner erred by ordering him to show cause on Lesinski's motion for contempt because JM was returned to Lesinski before the order to show cause was

8

No. 55093-8-II

entered, leaving the commissioner no reasonable cause to believe that Mienko had not complied with the August 14, 2020 order. We disagree.

RCW 26.09.160(2)(a) provides, "If the court finds there is reasonable cause to believe the parent has not complied with the order [setting residential provisions for a child], the court may issue an order to show cause why the relief requested should not be granted." Nothing in chapter 26.09 RCW or our case law defines what the legislature meant by "reasonable cause" in this context. Yet we can surmise that reasonable cause exists where the motion and supporting declarations present facts and circumstances that support a reasonable inference that the parent has refused or failed to comply with a court order regarding the children.

In support of her motion for the contempt hearing, Lesinski made numerous allegations about Mienko's conduct both before and during the attempted exchange. Lesinski's declaration stated that Mienko actively withheld JM and purposely caused JM to believe that he did not have to comply with the parenting plan. Those allegations, if taken as true, would be sufficient to establish a reasonable inference that Mienko had violated the parenting plan and Commissioner Farmer's August 14, 2020 order requiring that JM go with his mother back to Michigan on August 16, 2020. Moreover, Mienko admitted in the hearing before Commissioner Johnson that he allowed JM's adult sister to be present on the morning of August 16, 2020. He also admitted that he tried to get Lesinski to change her mind in front of JM that morning.

9

No. 55093-8-II

In light of Lesinski's declaration, as well as Mienko's admissions, we hold that the commissioner had reasonable cause to believe that Mienko had not complied with the parenting plan and August 14, 2020 order.[1] The commissioner properly entered the order to show cause.

III. CONTEMPT FINDING

A.    Contempt Authority

RCW 26.09.184(7) provides, "Failure to comply with a provision in a parenting plan or a child support order may result in a finding of contempt of court." A parent "shall be deemed to have the present ability to comply with the order establishing residential provisions" unless by a preponderance of the evidence they establish "a reasonable excuse for failure to comply." RCW 26.09.160(4). A court shall find a parent in contempt if, "based on all the facts and circumstances, the court finds after [a] hearing that the parent, in bad faith, has not complied with the order establishing residential provisions for the child." RCW 26.09.160(2)(b). "An attempt by a parent . . . to refuse to perform the duties provided in the parenting plan . . . shall be deemed bad faith." RCW 26.09.160(1).

Refusal to comply with the parenting plan "shall be punished by the court by holding the party in contempt" and awarding "the aggrieved party reasonable attorneys' fees and costs incidental in bringing a motion for contempt of court." RCW 26.09.160(1). If a court finds a parent in contempt of a court order regarding residential time with a child, the court "shall" order

> (i) [t]he noncomplying parent to provide the moving party additional time with the child. The additional time shall be equal to the time missed with the child, due to the parent's noncompliance;

---

[1] Mienko also argues that there was no basis to enter a show cause order once JM had been returned to his mother. This argument assumes that contempt is only available to halt ongoing contemptuous behavior. This issue is addressed in more detail below.

No. 55093-8-II

>  (ii) The parent to pay, to the moving party, all court costs and reasonable attorneys' fees incurred as a result of the noncompliance, and any reasonable expenses incurred in locating or returning a child; and
>
>  (iii) The parent to pay, to the moving party, a civil penalty, not less than the sum of one hundred dollars.
>
>  The court may also order the parent to be imprisoned in the county jail, if the parent is presently able to comply with the provisions of the court-ordered parenting plan and is presently unwilling to comply. The parent may be imprisoned until he or she agrees to comply with the order.

RCW 26.09.160(2)(b).

Both the legislature and the Washington Supreme Court have drawn a distinction between punitive contempt sanctions and remedial contempt sanctions. RCW 7.21.010(2), (3); *Gronquist v. Dep't of Corr.*, 196 Wn.2d 564, 573-74, 475 P.3d 497 (2020). "'Remedial sanction' means a sanction imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform." RCW 7.21.010(3). "'Punitive sanction' means a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court." RCW 7.21.010(2). A sanction is criminal and therefore punitive in nature "if it is determinate and unconditional," and a court may not impose a punitive sanction without applying the due process procedures afforded to criminal defendants, including trial by jury. *In re Pers. Restraint of King*, 110 Wn.2d 793, 800, 756 P.2d 1303 (1988).

But a nonpunitive sanction order does not have to serve a coercive purpose and may instead address compensation to an injured party. *Gronquist*, 196 Wn.2d at 573. Continuing contempt is not a prerequisite to granting compensatory relief so long as the relevant statute allows the court to order the person found in contempt to pay a party for losses or costs associated with the contempt

11

No. 55093-8-II

or contempt proceedings. *See id.* at 574-75. In *Gronquist*, the Supreme Court emphasized that compensation to an injured party is a valid, nonpunitive function of a contempt order. *Id.* at 572-73. To hold otherwise, "disallowing any remedy when an act of contempt is discontinued at the eleventh hour," would be an untenable result, allowing contemnors "a safe harbor to violate court orders." *Id.*

"Punishment for contempt of court is within the discretion of the trial court" and will only be disturbed on appeal if the trial court abused its discretion by basing its decision on untenable grounds or for untenable reasons. *In re Marriage of Myers*, 123 Wn. App. 889, 892, 99 P.3d 398 (2004). On appeal, this court reviews the commissioner's findings of fact for substantial evidence and determines whether the findings support the conclusions of law. *In re Marriage of Rideout*, 150 Wn.2d 337, 350, 77 P.3d 1174 (2003). "'Substantial evidence' exists if the record contains evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re Marriage of Fahey*, 164 Wn. App. 42, 55, 262 P.3d 128 (2011) (quoting *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002)).

B.      Compensatory Sanctions under RCW 26.09.160

The commissioner in this case found contempt after JM had been returned to his mother's care, and the commissioner imposed the $100 civil penalty, as well as court costs and attorney fees. Mienko argues that this constituted a punitive sanction, which requires a trial by jury. He also argues that the contempt finding was defective because it did not give him an opportunity to purge the contempt. We disagree.

Although *Gronquist* interpreted the more general civil contempt statutes, including RCW 7.21.030, we hold that the Supreme Court's reasoning also applies to contempt sanctions for failing

12

No. 55093-8-II

to comply with residential provisions of a parenting plan under RCW 26.09.160. Like RCW 7.21.030, the plain language of RCW 26.09.160(2)(b) expressly allows compensatory sanctions in the form of making up lost time with the child, as well as a civil penalty and payment of costs and fees incurred. In addition, adopting Mienko's argument would lead to the same absurd results that the Supreme Court criticized in *Gronquist*. 196 Wn.2d at 572-73. If compensatory sanctions can only be imposed while the parent is not complying with a parenting plan, a parent could, after withholding a child for an extended period, turn over the child moments before the contempt hearing and escape all consequences. Thus, we hold that the commissioner had authority to find contempt and impose monetary sanctions under the plain language of the statute, even after Mienko's contemptuous conduct had ceased.

C.      Substantial Evidence for the Contempt Finding

Mienko also argues that the contempt finding necessarily implies that he was required to use physical force to effectuate the transfer, which neither the parenting plan nor the August 14, 2020 order required. Thus, he contends there was not substantial evidence supporting the finding of contempt. We disagree.

1.      Cases involving recalcitrant children and parents

If a child resists court-ordered residential time with a parent and "the evidence establishes that a parent either contribute[d] to the child's attitude or fail[ed] to make reasonable efforts to require the child to comply with the parenting plan and a court-ordered residential time, such parent may be deemed to have acted in 'bad faith'" under RCW 26.09.160(1). *Rideout*, 150 Wn.2d at 356-57. In *Rideout*, the trial court's findings of fact included that the mother was supposed to drop

13

No. 55093-8-II

off the daughter at her father's house and repeatedly failed to do so and that the mother involved her daughter in the contempt action to the point of having her sign a declaration. *Id.* at 346-47.

The Supreme Court held that there was substantial evidence to support the contempt finding. *Id.* at 359-60. The mother "sidestepped her responsibilities as a parent," but parents "have an obligation to attempt to overcome the child's resistance . . . to ensure that a child's residential time with the other parent takes place." *Id.* at 356. A parent is "obligated to make good faith efforts to require" their child to comply with court-ordered residential time and, although it is not appropriate to find a parent in contempt "for the actions of a truly recalcitrant child," contempt "is appropriate when the parent is the source of the child's attitude or fails to overcome the child's recalcitrance when, considering the child's age and maturity, it is within that parent's power to do so." *Id.*

This court has held that a contempt finding was supported by substantial evidence when a father admitted to intentionally refusing to comply with an alternate care provision in the parenting plan by dropping the child off with the father's girlfriend or child's grandmother instead of giving the mother the first option to care for the child. *In re Marriage of Eklund*, 143 Wn. App. 207, 213, 177 P.3d 189 (2008). And Division One held that a contempt finding was supported by substantial evidence when the father openly degraded the mother, was hostile to the authority of both an arbitrator and a guardian ad litem, and violated a parenting plan by delivering the child to third parties instead of the mother without adequate explanation. *In re Marriage of Farr*, 87 Wn. App. 177, 184-85, 940 P.2d 679 (1997). In contrast, Division Three affirmed a trial court's refusal to issue a contempt finding when the parents had a tumultuous relationship and communication

14

No. 55093-8-II

breakdown, and there was evidence that the father invited the mother's alleged contemptuous behavior. *In re Marriage of Williams*, 156 Wn. App. 22, 29, 232 P.3d 573 (2010).

    2.       <u>Contempt in the present case</u>

Both this court and the Supreme Court have emphasized the deference we give to judges and commissioners in family court who have had a chance to review all of the evidence. *Rideout*, 150 Wn.2d at 350-51; *Myers*, 123 Wn. App. at 892-93. The Supreme Court has afforded this deference to a commissioner even where they made their contempt finding based only on documentary evidence. *Rideout*, 150 Wn.2d at 359-60.

The commissioner here issued written findings stating that Mienko was able to follow the parenting plan, Mienko's failure to obey the parenting plan was in bad faith, and Mienko's explanation of his misunderstanding of the writ of habeas corpus was not credible. Similarly, the commissioner found that Mienko did not obey the August 14, 2020 order even though he was able to follow it. The contempt hearing transcript was not provided to this court so we do not have more detail about the commissioner's reasoning.[2]

Here, there was evidence that Mienko took steps to comply with the court's orders. We are cognizant of the difficult situation parents may face with a recalcitrant child, and we do not encourage parents to resort to physical force against a child or teenager. Short of using force, Mienko ensured JM was packed, and he invited Lesinski to talk alone with JM to see if she could convince him to go with her. When those tactics failed, Mienko suggested another transfer attempt

---

[2] It was Mienko's burden to provide an adequate record to support his appeal. *State v. Sisouvanh*, 175 Wn.2d 607, 619, 290 P.3d 942 (2012).

No. 55093-8-II

without NM's hostile presence. And Mienko himself requested the writ that finally convinced JM that his resistance to the transfer was futile.

But there is also substantial evidence in the record to support the contempt finding. Mienko's pretransfer communications with Lesinski appeared to be attempts to negotiate a resolution allowing JM to stay in Washington for the school year, despite the parenting plan. Mienko permitted NM, who was known to have a hostile relationship with Lesinski, to attend the attempted exchange and confront Lesinski in front of JM about her insistence that JM must leave with her. Mienko tried to talk Lesinski into letting JM remain in Washington in front of JM, very likely contributing to JM's hope he would be allowed to stay in Washington if he continued to refuse to leave. These actions do not constitute "reasonable efforts to require the child to comply with the parenting plan," and are substantial evidence that Mienko's conduct "contribute[d] to the child's attitude" in refusing to return to his mother's care. *Rideout*, 150 Wn.2d at 356-57.

There is sufficient evidence in the record to convince a "fair-minded, rational person" that Mienko violated the parenting plan and August 14, 2020 order intentionally and in bad faith. *Fahey*, 164 Wn. App. at 55. Moreover, even though reasonable minds might disagree as to whether contempt sanctions should have been imposed, applying the deferential abuse of discretion standard of review, we conclude that it was not an abuse of discretion for the commissioner to find contempt and order Mienko to pay a mandatory civil penalty as well as attorney fees.

ATTORNEY FEES ON APPEAL

Lesinski seeks attorney fees on appeal based on RCW 26.09.140 and .160. RCW 26.09.140 provides, "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs."

16

No. 55093-8-II

We may "consider the arguable merit of the issues on appeal and the parties' financial resources." *In re Marriage of C.M.C.*, 87 Wn. App. 84, 89, 940 P.2d 669 (1997). After considering the pleadings that the parties have filed regarding their financial resources, we decline to award attorney fees to Lesinski on appeal.

CONCLUSION

We hold that the commissioner did not err by ordering Mienko to show cause and we affirm the contempt finding. We decline Lesinski's request for attorney fees on appeal.

Glasgow, J.

We concur:

Lee, C.J.

Veljacic, J.

17