IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | |
| | ) | No. 36655-3-III |
| Elizabeth Hope Evarts, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| Jeremy Lucius Evarts, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — Hope Evarts appeals from numerous rulings of the trial court in a marital dissolution action. In addition to challenging the substance of the dissolution court's rulings, Hope claims error in the trial judge's refusal to recuse. Because Hope fails to present argument in her opening brief as to four of her five assignments of error and because substantial evidence supports the dissolution court's limitation of her visitation rights to her children, we affirm all rulings of the trial court.

## FACTS

Elizabeth Hope Evarts (Hope) and Jeremy Lucius Evarts (Jeremy) married one another on March 4, 2000. During the couples' sixteen year marriage, they beget four

children, two boys and two girls.

Hope Evarts earned a Bachelor's of Science in Horticulture, but ceased working outside the home on the birth of the couple's first child. As of the date of marital separation, Hope had stayed home to care for the children for fifteen years. Jeremy worked as director of sales at Armstrong Flooring and earned a base salary of $141,000. Some years he received a bonus.

We relate some of the background leading to the couple's separation not to embarrass either party, but to outline the evidence on which we conclude the dissolution court did not abuse its discretion when limiting Hope Evarts' visitation rights with the children. According to Jeremy, the couple's relationship deteriorated after Hope met her friend Beth in the fall of 2015. Shortly thereafter, Hope, in the couple's living room, performed an exorcism on Beth and removed demons from Beth. Hope thereafter reported to Jeremy of Beth receiving prophetic dreams consistent with the Bible. According to Hope, God, in turn, appointed Hope to translate Beth's visions. Hope began meeting every Sunday with Beth at the Evarts' residence. Eventually Beth and her son resided in the home. Hope allowed Beth to carry a handgun in the residence.

One morning in early 2016, while Jeremy was on a business trip to Saskatoon, Hope telephoned Jeremy. Hope immediately asked Jeremy: "'Who did you get a blow job from last night?'" Report of Proceedings (RP) (Oct. 23, 2017) at 167. Jeremy denied any oral sex. Hope replied: "'That's not true. I had a clear vision last night that

2

you were receiving oral sex from someone.'"  RP (Oct. 23, 2017) at 167-68.  On his return home, Jeremy asked Hope to engage in marriage counseling with him.  Hope refused because of her insistence in the accuracy of her dream.

Later one day, Hope and Jeremy Evarts sat together in the residence's living room.  Hope left her chair and approached Jeremy while speaking in tongues.  Jeremy is deaf in his right ear.  Hope informed Jeremy that a demon whispered to him in his deaf ear.  Hope then attempted to extricate the demon from the presence of Jeremy.  God had told Hope that the demon sat on Jeremy's right shoulder.

As the end time progressed, Hope told Jeremy about visions of rapture, ISIS assuming control of the entire world, imposition of martial law, and the end of the world at which time sinners will receive payment for sins.  As Hope's behavior changed, Jeremy assumed more parental duties.  He transported the four children to and from school.

The parties disagree as to what occurred one day in June 2016 with regard to Hope's cell phone.  According to Jeremy, Hope handed him her cell phone.  She then immediately lunged at him to snatch back her phone.  Hope remarked that he would never forgive her if he viewed data on the cell phone.

According to Hope Evarts, Jeremy sought to place a GPS tracker on her phone, so he asked to see the phone.  As soon as she handed the phone to him, she grabbed it back.  Jeremy, a six-foot-four man who weighs three hundred pounds, then jumped on her.  He

clawed her and usurped the phone. Jeremy removed the battery from the phone. Apparently, his intentions had changed from placing a tracker on the cell phone to disabling the phone. Without emotion, Jeremy announced that he must disable the phone because of his love for Hope and in order to prevent her from being tempted to commit a grievous sin. Hope then rinsed blood from her arm and took a nap.

Soon after the phone incident, Hope threatened to file a protection order if he did not co-sign a lease. If he signed the lease, she would kindly allow him to visit the children whenever he desired. They continued to share the same bedroom.

In July 2016, Jeremy asked Hope why she slept in the same bed with him if she worried for her safety. She thereafter refused him entry into the bedroom. Hope then wrote "Va J hole" on a box and placed it in Jeremy's car within the view of the children. RP (Oct. 23, 2017) at 205.

On August 15, 2016, the parties separated. Hope Evarts then filed a petition for order of protection against Jeremy. Jeremy then moved from the family home.

On August 29, 2016, Hope Evarts filed a petition for legal separation. She abandoned her request for a protection order in the case filed two weeks earlier. In the legal separation suit, the superior court entered a mutual restraining order. The court temporarily granted Hope residential placement of the four children, with Jeremy exercising visitation every Friday after school until Sunday at 6 p.m.

On September 27, 2016, the dissolution court ordered Jeremy Evarts to pay $4,000

per month in unsegregated family support to Hope. The court ordered both parties to pay fifty percent of the mortgage payment. The court altered Jeremy's visitation schedule to three mutually agreeable weekends per month and every Wednesday from 3 to 9 p.m.

Hope has not worked in agriculture in Washington and has looked at alternative careers. During the fourteen months between separation and the dissolution trial, Hope applied for four jobs. She remained unemployed at the time of trial.

In December 2016, Hope gift wrapped the couple's parenting plan and presented the present to Jeremy for Christmas. A card accompanied the gift, which card read: "'I was thinking, what is the one thing you must—you need most this celebration of Jesus' birth.'" RP (Oct. 19, 2017) at 123. On another occasion, Hope packed Jeremy's suits in a box and placed the box in his car. She placed on the box a label, on which she wrote: "Va-J hole suits." RP (Oct. 19, 2017) at 125.

Hope Evarts told the children that Jeremy is a narcissist, abuser, thief, and adulterer. While Jeremy and the children ate dinner one evening, Hope spoke, by speaker phone, to the five about Jeremy's faults. Hope enlightened the children that Jeremy had lost his salvation and would enter the underworld because of his evil behavior. She supported her accusations with Scripture passages. The children became upset and pleaded with Jeremy to repent.

On at least one occasion, while the children visited at their father's home, Hope sent text messages to the children, instructing them to call 911 and instructing them what to tell the police.

PROCEDURE

On February 14, 2017, Hope Evarts filed an amended petition for marital dissolution.

On April 19, 2017, Jeremy Evarts moved the court to permit third parties to transport the children between parents, to retrieve his boat from the marital home, and to change the visitation schedule to every other week for the upcoming summer school break. On May 24, 2017, the court granted the schedule change for summer break to one week on and off for each parent. The dissolution court also granted Jeremy possession of the boat and authorized family members to transport the children. When Jeremy and his friends went to the home to retrieve the boat, Hope's friend Beth, with approval from Hope, stood in front of the boat with a gun in a holster.

The dissolution court appointed a guardian ad litem for the children. The guardian ad litem filed a report that recommended that the mother be named primary residential parent. The guardian ad litem further recommended that the parents engage in parallel co-parenting classes and that the father and children engage in family therapy with an experienced therapist. The guardian ad litem reported that all of the children mentioned to her that their father quickly grows angry and frequently yells. According to the

6

guardian ad litem, the children were afraid of their father.

Trial began October 19, 2017. We recount some of the trial testimony of Hope, Jeremy, and witness Jodi Durr.

*Hope Evarts Trial Testimony*

During trial, Hope Evarts testified that she no longer calls Jeremy by his first name, but will call him "Evarts" or "Lucius." RP (Oct. 19, 2017) at 69. During trial, she generally addressed Jeremy as "Mr. Evarts," although she sometimes slipped into saying Jeremy. Hope explained she does not wish to call him the name she called him during those times he assaulted her.

Hope Evarts testified at trial that she primarily cares for the children, sets the family schedule, and orchestrates Jeremy's schedule. The oldest child, a daughter, receives professional counseling for anxiety. Recently the daughter started fires and stole food. While in a hotel room, Jeremy asked Mary, a pseudonym, for a back rub as he sat in his underwear on the bed. On another occasion and six times within a day, Jeremy entered Mary's room while she dressed despite her protests. Hope reported Jeremy's conduct to Child Protective Services, but the agency took no action.

Hope Evarts averred that she endured frequent violence from Jeremy. Jeremy particularly enjoyed strangling her. After an incident, she would nap or retire to bed for the night. She never reported the brutality to law enforcement. Jeremy last attacked

Hope on June 27, 2016, and their youngest son viewed, through a window, the assault. We do not know if this last incident involved Hope's cell phone.

Hope claimed that Jeremy also wreaked violence on the children, but she never observed such conduct. According to Hope, Jeremy knows how to hurt another without leaving marks.

Hope testified to Jeremy's "'vast infidelity.'" RP (Oct. 19, 2017) at 95. During a pretrial deposition, Hope accused Jeremy of sexual intercourse with others, but stated she had not observed the intercourse. Others, whom she either could not or would not identify, told her of the sexual intercourse.

During trial, Hope declared that she saw Jeremy receive oral sex from strangers. Jeremy drugged her before the sexual activity and drove her to a hotel room to watch. Jeremy meant for the drugs to prevent her from remembering the oral sex. The drugs also prompted her to participate in the sexual activity. Memories of the sexual perversions returned a year after the couple's separation. Hope accused Jeremy of grooming their eldest daughter for sexual abuse.

On one or more occasions, Jeremy drove Hope to a Seattle Freemont district sexual club at a legal office. She recognized high ranking people at the club, including chief executive officers of businesses, owners of businesses, fellow church members, lawyers, and a Pierce County Superior Court commissioner. The parties knew the court commissioner through church.

8

Hope Evarts wrote an e-mail to Jeremy that accused him of blocking her from sending and receiving texts and phone calls. During cross-examination at trial, she admitted that the phone company, not Jeremy, blocked the texts and calls.

Hope wrote another e-mail to Jeremy Evarts that reproached him for hacking into her Google Internet account. During trial, she admitted that she lacked proof of this criminal behavior, but that her daughter informed her of Jeremy's misdeed.

According to Hope, she did not sign or authorize her signature on the 2016 tax return, and did not receive any of the refund. At trial, she asked for half the refund. She also requested spousal maintenance of $7,000 for four years.

Before her testimony ended, opposing counsel asked Hope Evarts if she wished to recant any of her testimony. She responded: "'No. I spoke the truth.'" RP (Oct. 23, 2017) at 250.

*Jeremy's Testimony*

Jeremy Evarts disagreed with a guardian ad litem report that claimed a fractured relationship between him and his eldest daughter. He denied watching the daughter undress. He once asked the daughter to rub some muscle relaxant on his back, but he did not wear only underwear then.

*Jodi Durr*

Jodi Durr, Hope's friend, testified. According to Durr, Hope told her that Beth saw angels and demons and glimpsed prophetic visions of terrorists capturing the United

9

States and imposing martial law. Jodi then expressed concern to Hope about Hope's new friend, Beth.

According to Jodi Durr, Hope Evarts never complained about Jeremy physically or sexually abusing her. Durr never observed Hope's attitude, demeanor, or countenance as displaying effects of abuse. Hope never cowered around Jeremy and maintained the ability to confront him. When Hope mentioned the cell phone incident to Durr, Jodi asked Hope if Jeremy had ever abused her or the kids. Hope answered in the negative. Hope added that she knows how to control Jeremy.

In closing argument, Jeremy asked the court to grant residential placement of the four children with him and to order Hope to undergo a psychological evaluation. He suggested that Hope could share custody after found to be mentally and physically capable to co-parent.

After closing, the dissolution court remarked:

> THE COURT: I have a lot of things to say. I don't typically rule from the bench, and I'm not doing that, but I am going to enter some temporary orders.
> Ms. Evarts, your testimony was really, really frightening to me. Disturbing, frightening. I don't know whether it's true or not, doesn't sound like it to me, but I don't know. If it's not true, you've really slandered some people. And one of them is one of my judicial colleagues [the Pierce County Superior Court commissioner], which is a problem for him. So it's either true or it's not true. If it's true, he's a monster. If it's not true, you're a monster. There's no other way to say that.
> I need help to sort this out. So I am going to order psychological evaluations of both of them [Hope and Jeremy]. I need to have more information. I respect Laurie Harrison, as well. She didn't find any

10

diagnosis with Mr. Evarts. She did find that Ms. Evarts had an adjustment disorder with anxiety and dependent personality. So she found a little something, at least. But I need to have a PhD level evaluation.

Since Thursday and your testimony, I have worried about your children. I've worried about this case. I have been doing this for almost 20 years, and I've never heard anything like this before. And it's deeply, deeply disturbing. Except for in a criminal context, I must say, things happen in that context. But not with a dissolution, not when we're talking about children and we're talking about people's lives. So it's really scary to me.

So I'm going to order that. The only person with money here is Mr. Evarts, so he's going to pay for that.

. . . .

It's what to do with the kids that I just struggle with. I really do. I don't disagree with having them go immediately to their father and having supervised visitation for you, because I don't know what else to do to protect them. I don't know what else to do.

As I said, I've lost a lot of sleep about this. I read a lot of the exhibits. I read a lot of the exhibits that are the texts and the communications, just as Mr. Loran said. There is no respect there. There's hatred, there's bitterness. Your credibility is questionable for me. But as I said, I need help with that.

So I think that's what I'm going to do. I am going to order that today they be transferred to their father and she have supervised visitation until I get these psychological evaluations.

I hope, I hope that through this process—this is temporary, this is only temporary—that we can move closer. You guys couldn't decide yourselves, so then you bring it to me. Then there's this incredible testimony that happens on Thursday, and I'm struggling with what to do with it the whole time.

These children have two parents who love them, who love them to death, and want to support them. And I want them to have both of their parents healthy and happy and supportive to them. And I can't—I can't let you be with them unsupervised right now. I just can't. I don't know what else to do.

So other pieces is we need to have an immediate appraisal of the home.

There's certainly—if it's supervised visitation, both ways, there's absolutely no negative comments about the other parent.

11

I think the children need to be in aggressive counseling.

RP (Oct. 23, 2017) at 279-82.

At the conclusion of trial, the dissolution court ordered a psychological evaluation for both parents. The court also ordered the children to temporarily reside with the father, with the mother receiving supervised visits with the children three times a week. The court enjoined Hope from calling, texting, or e-mailing the children unless supervised. The court ordered continued maintenance for Jeremy to pay Hope.

The dissolution court, after reviewing an appraisal of the family home and psychological evaluations of the parties by Dr. James Manley, reconvened on December 21, 2017. In the meantime, Hope had exerted no effort to obtain employment. The dissolution court commented during the December 21 hearing:

> THE COURT: My concern, and I'm guessing for member of the audience, I would say the line [from Dr. Manley's report] that's most concerning to me is, 'However, her elevated level of defensiveness, repressed anger, along with her negative and polarized perspective of Mr. Evarts, may emotionally impact the children.' *And I'll make a specific finding that it does impact the children*, and I'm going to continue to have the children stay with Mr. Evarts.

RP (Dec. 21, 2017) at 5 (emphasis added).

At the December 21 hearing, the dissolution court ordered supervised visitation for Hope with the children until a significant psychological intervention. The court hoped that supervised visitation would decrease polarization and alienation of affections. The court awarded the family home to Jeremy and ordered Hope to vacate the family home by

12

December 31, 2017. The dissolution court ordered Hope to engage in counseling.

Finally, the court ordered Jeremy to pay $2,000 a month to Hope.

On January 18, 2018, Hope Evarts filed a motion for disqualification of the trial

judge, for reconsideration, and for a new trial. Hope claimed irregularities prevented her

from enjoying a fair trial and no evidence justified the dissolution court's decisions.

Hope argued that her accusation against the court commissioner tainted the court's

decision. Hope accompanied her motions with forty pages of Internet information on

psychological disorders and a ninety page list of every DSM V diagnosis. On January

22, 2018, the dissolution court issued a letter ruling on distribution of assets and

liabilities.

The dissolution court reconvened again on January 26, 2018 for the presentation

of final orders. During the hearing, the court bespoke oral findings to attach to the

parenting plan and dissolution decree. The dissolution court commented:

> THE COURT: But let me, for the record, I would like to make
> formal findings regarding the Parenting Plan, which is also not addressed in
> the letter.
> . . . .
> RCW 26.09.183(3) talks about residential provisions, and it says,
> "The court shall make residential provisions for each child which
> encourage each parent to maintain a loving, stable and nurturing
> relationship with the child consistent with the child's developmental level
> and the family's social and economic circumstances. The child's
> residential schedule shall be consistent with RCW 26.09.191." And here I
> will find 191 factors against mother under (e) "the abusive use of conflict
> by the parent which creates the danger of serious damage to the child's

13

psychological development," and under (g) "such other factors or conduct as the court expressly finds adverse to the best interest of the child."

I did not find Ms. Evarts credible. It's clear from all the evidence that the Evarts had a fairly traditional division of labor in their marriage. . . .

. . . .

Ms. Evarts' testimony was pretty arrogant and condescending regarding Father's role. . . .

Exhibit 61, the e-mails in which Mr. Evarts requested to switch, Ms. Evarts testified, and it's in the e-mail, "I decided to put the decision in the children's hands." There's several issues replete in the record of Ms. Evarts talking about court involvement.

It's really bad for kids to know about what's going on in court and to involve them. It's very bad judgement to have the children vote on whether to switch a visitation day. In her e-mail, she said she have them vote three times and she said that every time the vote is the same.

She sent messages through the children, as well as paperwork through the children. Again, kids need to be kids and not be involved in the court situation.

She accused her husband of vast infidelity. She said she was drugged and abused. She was taken from the home in the middle of the night. And I wondered if that was true, who was caring for the kids? She said she has no memory, had no memory, but now the memories are coming back. It was very odd testimony. I told everybody that before. I was very concerned. At that time she was constantly smiling at the court, this judicial officer, as well as smiling at her husband, which I found to be very strange demeanor while giving this kind of very ugly testimony

She said people talk to her about his infidelity but she doesn't say who. . . . She said she was scared of her husband, at the deposition. And while she was testifying, my observation is that she's not scared of anything. . . . She appears very sure of herself and very destructive in her story telling.

. . . .

She did not tell the guardian ad litem regarding the sex acts. . . .

. . . .

The exhibits—especially the e-mails, Exhibits 49, 50, 51, 52, 53, 54, 55—are all hostile, rude and condescending, as concerned about the texts to her daughter. Exhibit 75 is the Christmas present for her husband, the Parenting Plan wrapped. She testified that was not sarcastic; she was very serious. I did not find that believable.

14

She put her husband's suit in a box, that's Exhibit 83, and she wrote on the label, the quote unquote, "the J hole suits." When asked why, she said she felt it was appropriate. . . .

I found Mr. Evarts testimony to be credible. . . . He recognizes that [the oldest daughter] is in a difficult situation. She [the daughter] thinks bad things about him and hears about bad things and sees writings that are bad. She [the daughter] knew all the trial details, the blog details and Mother is constantly texting [the daughter]. It's clear to me that [the daughter] did know too much about court.

Mr. Evarts had testified about describing a very good and happy marriage. And it was clear that prior to two years ago Ms. Evarts was, he said, "The best mom, but she was now making decisions that put their children at risk." And I think that is an excellent summary of the evidence that was presented and the Court's concerns about her ability to safely parent. Safely, for the children's mental health. She is perfectly capable of taking care of their physical needs.

. . . .

After trial, but certainly relevant to the Court, is Dr. Manley's evaluation, and page 33 in particular. He made some observations. I'm quoting, "Ms. Evarts did not increase her sessions"—meaning sessions [with] her counselor—"once she reported memories of being abducted and used at a sex club began to emerge. She did not seek assistance through counseling after the children were placed with Mr. Evarts." I'm quoting again from Dr. Manley, "Overall, Ms. Evarts appears to be deeply committed in her new way of seeing things." And then he says later on, "Also noted during the clinical interview was emotional detachment despite the abuse she reported. Absent were tears or signs of anger. At times her responses seemed scripted and were ph[r]ased in a defensive or curricular manner." In his report he says, "Ms. Evarts suffers from a dependent personality with histrionic personality traits. This condition leaves her indecisive and vulnerable to influence by others."—this is quoting from Dr. Manley again—"While Ms. Evarts report of verbal domestic violence abuse seems plausible, I do not find that her claims of being drugged, moved and led to engage in sexual acts in front of strangers credible. In addition, her reports of hundreds of instances of physical domestic violence is also unlikely."

I read it before out loud, but I'll highlight it again: "She is not viewed as a risk for physical child maltreatment. However, her elevated level of defensiveness, repressed anger, along with her negative and

15

> polarized perspective of Mr. Evarts may emotionally impact the children."
>
> At the time of trial, there was a high level of what has been termed now as interparental hatred by Ms. Evarts, and she has done everything that she can to alienate the children from their father. I do not believe that she is a victim of domestic violence. I did not find her testimony credible. That is why I placed the children with Mr. Evarts and why there are such restrictions on her contact with the children until she gets some effective counseling to deal with her anger toward Mr. Evarts.
>
> So I would like to attach my oral ruling to the Findings and that can be put in the Decree and the Findings of Fact.

RP (Jan. 26, 2018) at 14-23.

During the January 26 hearing, the dissolution court entertained argument about spousal maintenance. Hope requested $4,000 for four years. The court awarded maintenance in the amount of $1,500 for six more months and then $1,000 for the next six months. The court remarked:

> I think that makes it fair and equitable and gets her a little bit more time to try to get on her feet. She will have plenty of assets now. You can incorporate that into the paperwork.

RP (Jan. 26, 2018) at 23. The court awarded Hope the aggregate of $261,494 from the 401(k) and Edward Jones accounts.

The dissolution court denied the motions for disqualification, reconsideration, and a new trial. On January 26, 2018, the court entered final orders. The dissolution court awarded Jeremy the house, $139,494 from the 401(k) account, and $122,000 from Edward Jones account. Hope was awarded $6,000 from her IRA, $139,494 from Jeremy's IRA 401(k) account, and $122,000 from Jeremy's Edward Jones account. Hope

was awarded maintenance of $1,500 for six months and $1,000 for an additional six months to be offset by her $200 child support obligation to Jeremy. The dissolution court entered findings of fact and conclusions of law about the marriage. Spousal support was ordered because Hope has the need for spousal support and Jeremy has the ability to pay. The court ordered each party to pay his/her own legal fees and costs. Under "Other Findings or Conclusions," the dissolution court declared:

> The Court's oral rulings of October 23 and December 21, 2107, transcripts of which have been filed, and the Court's letter ruling of January 22, 2018 are incorporated herein as if fully set forth, as is the Court's oral ruling of January 26, 2018.

Clerk's Papers (CP) at 604.

The dissolution court ordered Hope Evarts to pay $200 child support each month to Jeremy. The final parenting plan, which the court declared to serve the children's best interests, detailed:

> [Section] 3. Reasons for putting limitations on a parent (under RCW 26.09.191)
> . . . .
> b. Other problems that may harm the children's best interests:
> A parent has one or more of these problems as follows:
> Emotional or physical problem—Elizabeth Evarts has a long-term emotional or physical problem that gets in the way of his/her ability to parent.
> Abusive use of conflict—Elizabeth Evarts uses conflict in a way that endangers or damages the psychological development of a child listed in 2.
> Other:
> Dr. James Manley has performed a psychological evaluation of Elizabeth [Hope] Evarts and his conclusions, which are contained in his report filed herein under seal, are incorporated herein. The court's oral

17

ruling, given on January 26, 2018, is incorporated herein as though fully set forth.

> [Section] 4. Limitations on a parent
> The following limits or conditions apply to Elizabeth Evarts.
> Limited contact as shown in the Parenting Time Schedule below.
> Supervised contact. All parenting time shall be supervised. Any costs of supervision must be paid by Elizabeth Evarts.
> The supervisor shall be Kate Lee's associate, until replaced per the court's Jan 19. 2018 order. The dates and times of supervised contact will be as shown in the Parenting Time Schedule below.

CP at 605-06 (boldface omitted). The parenting plan granted Hope three supervised visits per week up to two hours per visit. The court ordered Hope to engage in counseling. The dissolution court agreed to review the parenting schedule on June 15, 2018.

## LAW AND ANALYSIS

Hope Evarts assigns error to the dissolution court's entry of a parenting plan that granted Jeremy principal residential placement of the children and limited her visitation to supervised visitation, the court's grant of limited spousal maintenance, the court's refusal to award her reasonable attorney fees and costs, the court's refusal to address the distribution of the 2016 federal income tax refund, and the dissolution judge's refusal to recuse herself. We decline to entertain some of the assignments. Otherwise, we find no errors.

## Parenting Plan

Hope Evarts assigns error to the dissolution court entering a parenting plan that

placed primary residential placement of the children with Jeremy, that imposed RCW 26.09.191 restrictions on her, and that required professionally supervised visitation. In doing so, she assigns error to twenty-six findings of fact that support the court's three orders. Some of the findings come from the parenting plan and some from the court's oral remarks at the conclusions of the hearings. The findings refer to Hope as "Elizabeth." Those findings read:

> Elizabeth Evarts has a long-term emotional or physical problem that gets in the way of his/her ability to parent.
> . . . Elizabeth Evarts uses conflict in a way that endangers or damages the psychological development of a child.
> . . . .
> Dr. James Manley has performed a psychological evaluation of Elizabeth Evarts and his conclusions, which are contained in his report filed herein under seal, are incorporated herein. . . .
> . . . .
> . . . All parenting time shall be supervised. Any costs of supervision must be paid by Elizabeth Evarts.
> . . . .
> . . . Who can make major decisions about the children? [Jeremy Evarts].
> . . . .
> Major decision-making must be limited because one of the parents has problems as described in paragraph 3.a. above.
> . . . .
> The custodian is Jeremy Evarts.

CP at 606-07 (boldface omitted).

> [Elizabeth Evarts] is not going to have the children for a period of time.
> . . . .
> I did not find Ms. Evarts credible.
> . . . .

Ms. Evarts' testimony was pretty arrogant and condescending regarding father's role.

. . . .

. . . It's very bad judgment to have the children vote on whether to switch a visitation day. . . .

. . . .

She appears very sure of herself and very destructive in her storytelling.

. . . .

The exhibits—especially the e-mails, exhibits 49, 50, 51, 52, 53, 54, and 55—are all hostile, rude and condescending, as concerned about the texts to her daughter. Exhibit 75 is the Christmas present for [Jeremy Evarts], the parenting plan wrapped. She testified that that was not sarcastic; she was very serious. I did not find that believable.

. . . .

I found Mr. Evarts' testimony to be credible.

. . . .

Mr. Evarts had testified about describing a very good and happy marriage. And it was clear that prior to two years ago Ms. Evarts was, he said, "[t]he best mom, but she was now making decisions that put their children at risk." And I think that is an excellent summary of the evidence that was presented and the [c]ourt's concerns about her ability to safely parent . . . for the children's mental health.

. . . .

He [Jeremy Evarts] testified about the June 27, 2016 incident, the conflict regarding Ms. Evarts' phone. . . . And I found his testimony to be credible in regards to that struggle. . . .

. . . .

At the time of trial there was a high level of what has been termed now as interparental hatred by Ms. Evarts, and she has done everything that she can to alienate the children from their father. I do not believe that she is a victim of domestic violence. I did not find her testimony credible.

That is why I placed the children with Mr. Evarts and why there are such restrictions on her contact with the children until she gets some effective counseling to deal with her anger toward Mr. Evarts.

RP (Jan, 26, 2018) at 9-23.

Ms. Evarts, [your] testimony was really, really frightening to me.

20

Disturbing, frightening. . . .  And it's deeply, deeply disturbing.

. . . .

. . . I don't disagree with having them go immediately to their father and having supervised visitation for you, because I don't know what else to do to protect them. . . .

. . . There is no respect there.  There's hatred, there's bitterness.

RP (Oct. 23, 2017) at 280-82.

[T]he line [from Dr. Manley's report] that's most concerning to me is, "[h]owever, her elevated level of defensiveness, repressed anger, along with her negative and polarized perspective of Mr. Evarts, may emotionally impact the children."  And I'll make a specific finding that it does impact the children, and I'm going to continue to have the children stay with Mr. Evarts.

I'm also going to continue with supervised visitation until there's been some significant psychological intervention consistent with what Dr. Manley has recommended, with a nonreligious licensed psychologist or counselor, master's level counselor, to deal with some of the anger and disregulation that's been listed in the report.  So that therapist needs to have a copy of [Dr. Manley's] report as well as Lori Harrison's report.

In light of that, I'm also going to award the house to Mr. Evarts and have the children move in there with him, because I think that's what is best for them. . . .  I'm suggesting sooner rather than later.

RP (Dec. 21, 2017) at 5-6.

Despite assigning error to the twenty-six findings of fact, Hope Evarts offers no analysis in her brief challenging the discrete findings.  In her opening brief, Hope recites numerous principles of law, but presents no analysis as to how the principles apply to this appeal.  This court does not review issues not argued, briefed, or supported with citation to authority.  RAP 10.3(a)(6); *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012).  When a

21

party fails to present argument about a challenged finding, this court need not consider the assignment of error. *State v. Living Essentials, LLC*, 8 Wn. App. 2d 1, 14, 436 P.3d 857 (2019). Stated differently, a party abandons the assignments of error that it does not discuss in its brief. *Greensun Group, LLC v. City of Bellevue*, 7 Wn. App. 2d 754, 780 n.11, 436 P.3d 397 (2019). We could summarily affirm the dissolution court's rulings with regard to the parenting plan.

Hope Evarts assigns error to the dissolution court finding Jeremy to be credible and finding her to lack credibility. Reviewing courts will not reweigh the credibility of witnesses on appeal. *State v. Living Essentials, LLC*, 8 Wn. App. 2d 1 at 14 (2019).

We review a trial court's parenting plan for an abuse of discretion, which occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). The trial court's findings of fact are verities on appeal if supported by substantial evidence. *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). Evidence is "substantial" when it is sufficient to persuade a fair-minded person of the truth of the matter asserted. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).

Hope argues in general that insufficient evidence supported a finding or ruling that a mental health issue interfered with her parenting. RCW 26.09.191 governs Hope Evarts's appeal of limitations on her visitation. The statute declares:

(2)(a) The parent's residential time with the child shall be limited if it is found that the parent has engaged in any of the following conduct: (i) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions; (ii) physical, sexual, or a pattern of emotional abuse of a child. . . .

. . . .

(3) A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:

. . . .

(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

. . . .

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

RCW 26.09.191 bars the dissolution court from precluding or limiting any provisions of the parenting plan unless the evidence shows that a parent's conduct may adversely affect the child's best interests. *In re Marriage of Chandola*, 180 Wn.2d at 642 (2014). Any visitation restrictions must be analyzed against RCW 26.09.191 provisions that favor maintaining a relationship between parent and child. *In re Marriage of Underwood*, 181 Wn. App. 608, 612, 326 P.3d 793 (2014). Subsection (3)(e) requires substantial evidence that creates a danger of serious damage to a child's psychological development. *In re Marriage of Burrill*, 113 Wn. App. 863, 871 n.6, 56 P.3d 993 (2002). The dissolution court must explain why the RCW 26.09.191(3) factors support the limitations.

The dissolution court heard substantial evidence, including Hope's own testimony, establishing that Hope actively engaged in alienating the children from Jeremy and

thereby damaged the children's emotional stability. Evidence showed that Hope coached the children to dislike their father and she contrived incredible stories of physical and sexual abuse. Hope filed a protection order without cause as threatened because Jeremy did not sign a co-lease. At the start of the case, she called Jeremy by his first name and, as the case progressed, she refused to use his first name. She was not flexible in trading residential time or providing clothes for the children's trip. She allowed the children to decide whether to accept a visitation change that would benefit Jeremy. She accused Jeremy of sexually grooming their daughter, instructed the daughter how to confront her father, presented the temporary parenting plan as a Christmas gift packaged in gift wrapping, and labeled a suit box with Va-J Hole. Hope told the children that their father was a narcissist, an abuser, a thief, an adulterer, and a lost sinner in the arms of an angry god. Frightening the children into believing their father is damned such that the children plead with the father to repent constitutes the epitome of alienation. Text message exhibits confirmed that Hope coached the children on statements about their father.

Jodi Durr, a former friend with Hope, confirmed Jodi's claims of viewing visions and Beth's influence on Hope. Jodi averred that she never observed Jeremy abuse or manipulate Hope. Hope was capable to resist any potential intimidation or compulsion from Jeremy. Thus, Durr's testimony confirmed Hope's extravagant deceptions about alleged misconduct of Jeremy, which Hope shared with the children. The provision of this information to the children would cause them more fear of their father.

24

The dissolution court relied on a psychological evaluation performed by Dr. John Manley. Manley disbelieved Hope's stories of being drugged, being forced to engage in sexual acts, and sustaining physical domestic violence. Dr. Manley concluded that Hope's elevated level of defensiveness, repressed anger, and negative polarized perspective of Jeremy may emotionally impact the children.

The court expressly found that the restrictions were in the best interest of the children. The court met the objectives of RCW 26.09.191 and protected the children from Hope's animosity toward their father until such time that Hope demonstrates she received needed psychological assistance. This minimized the children's exposure to harmful parental conflict and was in the best interest of the children.

Hope's alienating behavior echoes that of the father in *In re Marriage of Farr*, 87 Wn. App. 177, 940 P.2d 679 (1997), wherein the court found that exposing the children to parental conflict sufficient to find contempt and suspend residential time with the children. Hope's false allegations against Jeremy parallel the wife's accusations in *In re Marriage of Burrill*, 113 Wn. App. 863 (2002), wherein the court found that the unfounded allegations of unfitness to parent against the father created a danger of serious psychological damage to the children that warranted a restriction of residential time.

In her reply brief, Hope Evarts presents a series of terse comments in serial fashion. Hope mentions that Jeremy never sought RCW 26.09.191 limitations to her visitation with the children. Hope, however, presents no citation to authority that

precludes the dissolution court on its own from entering limitations without a request

from the other parent. Since the law tasks the court to further the children's best

interests, the dissolution court should hold the prerogative to impose limitations on its

own. Anyway, in his testimony, Jeremy suggested limited visits.

Hope observes that no professional recommended limited visitation. Nevertheless,

Hope forwards no law that holds that limiting a parent's visitation requires a professional

opinion.

Hope inserts into her reply brief events that occurred after the dissolution court's

rulings on appeal. Hope has not appealed any of those rulings or assigned error to any of

the rulings.

### Spousal Maintenance

Hope Evarts next assigns error to the dissolution court's limiting her spousal

maintenance to six months at $1,500 per month and an additional six months at $1,000

per month. Nevertheless, in her argument of law in her opening brief, she cites case law

without any analysis showing the dissolution court's award to be erroneous. She presents

those facts she believes shows error for the first time in her argument in her reply brief.

Jeremy had no ability to respond to the argument, since the respondent cannot file a reply

brief. For this and other reasons, an appeals court will not review argument submitted by

the appellant for the first time in the reply brief. *Doe v. Doe*, 160 Idaho 854, 380 P.3d

175, 181 (2016); *Piper v. Moran's Enterprises*, 121 Ill. App. 3d 644, 459 N.E.2d 1382,

1386, 77 Ill. Dec. 133 (1984). Points given only a cursory treatment in the argument

portion of a brief will not be considered on appeal, even if developed in the reply brief.

*In re Dissolution of Marriage of Alaback*, 997 P.2d 1181, 1184 n.3 (Alaska 2000). Thus,

we decline to address this assignment of error.

Attorney Fees before Dissolution Court

Hope Evarts next assigns error to the dissolution court's refusal to grant her an

award of reasonable attorney fees and costs. She perpetrates the same mistake, however,

as she commits regarding her assignment of error regarding spousal maintenance. In her

opening brief, she cites the statute that allows the court to award fees, and she cites

relevant case law, sometimes twice, but presents no analysis as to why the dissolution

court abused its discretion when denying her an award of fees. She presents no reasoned

analysis based on the facts to support her claim of error. Her argument, albeit stunted

argument, comes only in her reply brief. Therefore, we decline to address this third

assignment of error.

Dissolution Court's Recusal

Once again, Hope Evarts defies principles of appellate review with her assignment

of error with regard to the trial judge's refusal of recusal after her first rulings. In her

opening brief, Hope quotes a lengthy passage from *In re Personal Restraint of Davis*, 152

Wn.2d 647, 101 P.3d 1 (2004), without citing the page number of the excerpt. She then

announces the *Davis* court's decision. She offers no analysis as to how the passage

applies to the facts of her appeal, let alone any examination as to why the dissolution court committed error by denying her motion for recusal. For the first time in her reply brief, she submits a stunted argument regarding reasons for recusal. Therefore, we decline to address this fourth assignment of error.

### 2016 Income Tax Return

As her last assignment of error, Hope Evarts contends the dissolution court erred by not addressing the distribution of the 2016 federal income tax return refund. In support of this assignment of error, Hope writes one sentence in her opening brief: "RCW 26.09.080 requires the court to dispose of the property of the parties." Br. of Appellant at 36. In her reply brief, Hope does not mention this fifth assignment of error.

Jeremy Evarts responds that he placed the refund in a bank account before trial. Therefore, the refund no longer existed as a discrete asset, but instead became part of financial accounts for purposes of allocation of the parties' property. According to Jeremy, the dissolution court knew the amounts held by the respective parties in bank accounts and properly allocated the assets. Since Hope provides no arguments or evidence to the contrary, we reject her final assignment of error.

### Attorney Fees on Appeal

Both parties request an award of reasonable attorney fees against the other on appeal. Hope seeks recovery on the basis of her need and Jeremy's ability to pay. Jeremy seeks recovery on the basis of Hope's appeal being frivolous.

RCW 26.09.140 declares, in part:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.
>
> Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs.

The party seeking fees on appeal based on financial need must serve on the other and file a financial affidavit, no later than ten days before the date of oral argument or consideration on the merits. RAP 18.1(c). We do not address Hope Evarts' request for fees because she has filed no financial affidavit.

RAP 18.9(a) provides, in part:

> The appellate court on its own initiative or on motion of a party may order a party or counsel . . . who . . . files a frivolous appeal, or fails to comply with these rules to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply. . . .

We review the following factors when assessing whether an appeal is frivolous:

> (1) A civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are rejected is not frivolous; (5) an appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal.

*Streater v. White*, 26 Wn. App. 430, 435, 613 P.2d 187 (1980).

We conclude that Hope Evarts' appeal is frivolous. Overwhelming evidence supports the dissolution court's limitation of Hope's visitation. Hope fails to follow principles of appellate review with regard to four of her five assignments of error. Therefore, we grant Jeremy an award of reasonable attorney fees and costs incurred on appeal.

## CONCLUSIONS

We affirm all rulings of the dissolution court. We grant Jeremy Evarts an award of reasonable attorney fees and costs against Hope for fees and costs incurred on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.